## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO.  21-CR-094 (RBW)** |
| **v.** | : | |
| | : | |
| **ANTHONY R. MARIOTTO,** | : | |
| **Also known as "TONY MARIOTTO,"** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Anthony Mariotto to a split sentence of four months of incarceration, a period of 36 months of probation, and $500 in restitution.[1]

### I.      Introduction

The defendant, Anthony Mariotto, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

---

[1]  A period of probation after a term of incarceration is appropriate in the defendant's case.  The general prohibition against sentences that combine continuous incarceration and a term of probation, *see* 18 U.S.C. § 3551(b), does not apply where, as here, the defendant is sentenced for a petty offense, *see* 18 U.S.C. § 3561(a)(3); *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009).

The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  As explained herein, the government is requesting a period of four months of incarceration and $500 in restitution in this case based on the fact that: (1) the defendant entered the Capitol building through an obviously damaged Senate Wing Door approximately five minutes after it was breached; (2) the defendant entered and remained in a highly sensitive area of the Capitol building, the Senate Gallery, took a selfie-style photograph while inside the Senate Gallery and posted it to Facebook with the caption "I'm in [sic] And there are just a few [sic] This is our house," and deleted his Facebook account soon thereafter; (3) the defendant was present for and recorded assaults against the police inside the Capitol building; (4) while walking through several hallways, the defendant chanted "Where Are the Traitors" and attempted to open multiple closed doors; (5) the defendant provided a post-arrest interview to a local news station minimizing his conduct on January 6, 2021; and (6) the defendant does not have a criminal history.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.  Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification, combined with the defendant's recording of assaults against law enforcement, entry through the Senate Wing Door just minutes after it was breached; and his entry into the Senate gallery renders a significant jail sentence both necessary and appropriate in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 1 (Statement of Facts).  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to the defendant's conduct and behavior on January 6.

### *Anthony Mariotto's Role in the January 6, 2021 Attack on the Capitol*

Anthony Mariotto traveled to Washington, D.C., from his home in Florida to attend the "Stop the Steal" rally.  After attending the rally, the defendant walked to the Capitol building. Recording the walk with his cell phone, the defendant approached the west side of the Capitol building and walked around a temporary police bike-rack type of barricade on the Capitol grounds. Still recording, when the defendant approached a fence line with a sign that read "Area Closed," as depicted in the screenshot below, taken from a video he recorded, a voice consistent with the defendant's voice stated, "area closed.  Yeah, right."[2]  He then walked around the fence and "Area Closed" sign to join the crowd on the West Lawn.

---

[2]      Most of the footage the defendant recorded was of the events around him; that is, he physically appeared in very little of the footage he recorded.  Thus, the audio statements attributed to the defendant in this memo were not accompanied by actual video footage of him making the statements.  However, the same specific voice was heard in many of the videos and was louder than the others, as if it was closest to the microphone.  Based on this, as well as on other evidence, including an interview the defendant gave to a local news station, discussed *infra*, the government submits that the voice making the statements discussed herein are consistent with the defendant's voice.

3



Despite the crowd that arrived before him, the defendant made his way to the front of the mass of people, directly in front of the officers dressed in riot gear and armed with tear gas, as depicted in the screenshot below, taken from a video he filmed.



Still recording his progress, the defendant made his way up the stairs on the northwest side of the building, which was covered with scaffolding and tarps in preparation for the upcoming inauguration of President Biden. The defendant recorded the mob of people on the stairs, including people climbing the scaffolding. As he made his way up the stairs, a voice consistent with the defendant's stated "no one is going to steal our fucking election."

Entering the Capitol building through the Senate Wing door – which had a visibly broken window and broken out windows on either side of it from the rioters that breached the windows and door approximately five minutes earlier – a voice consistent with the defendant's chanted "Our House" as he walked through the door. Other rioters yelled "welcome home, patriots," and a voice consistent with the defendant's answered, "that's right," all while an alarm blared in the background and the defendant raised his fist in triumph, as seen in the below screenshot from Capitol surveillance video.



The defendant later claimed that officers waved him inside, however there is no evidence of any officers doing so when the defendant entered. The defendant turned to the right and walked

through a hallway that took him past the Spouse's Lounge.   Along the way, the defendant attempted to open multiple closed, and apparently locked, doors while a voice consistent with the defendant's yelled, "where are the traitors?"   The same voice chanted "USA" while inside the hallways, something that the defendant admitted to law enforcement that he chanted while inside the Capitol.

From there, the defendant traveled to the Crypt, arriving just moments after United States Capitol Police (USCP) officers were forming a line to block the rioters.   Apparently observing this, a voice consistent with the defendant's yelled, "yeah, like they're going to stop us."   The defendant again made his way to the front of the crowd, where he stood in front of the officers and recorded their efforts to contain the throng of people confronting them, as depicted in the screen shot below from a video taken by the defendant.



Approximately one minute after the above screenshot, the crowd rushed past the officers, who quickly realized they were outnumbered and retreated into a hallway off the Crypt, where they again formed a line against the mob.   The defendant was not one of the individuals who

initially pushed past the officers.  However, as depicted in the below screenshot taken from a video filmed by the defendant, he stood by and watched.



The crowd quickly filled the Crypt and followed the police to the hallway.  The defendant walked with and continued filming the rioters — some of whom were yelling "hands up, don't shoot" and "we can breathe" – as they overran the Crypt and encountered the newly formed police line near the Memorial Doors.

As before, the defendant once again made his way to the front of the group, directly in front of the police line that formed.  While there, other rioters began saying things to the officers like, "just wait until we start pushing," and "if we were Antifa, you all would be dead."  The defendant did not engage in any of these comments with the officers or push or shove against them.  Neither, however, did he leave.  Indeed, he continued to film the mob and their confrontations with the police.  Moments later, an individual charged the police line and the entire crowd surged forward, pushing past the officers.  The defendant did not follow.  However, having just witnessed violence against the police, neither did he immediately leave the Capitol building.  Instead, he made his

way upstairs to the Rotunda, where he recorded other rioters who had forced their way into that location.

After exiting the Rotunda, the defendant walked to the Rotunda Doors, where three USCP officers, one of whom was wearing riot gear, were guarding the door, as captured in the below screenshot from a video the defendant recorded.



³ A few minutes later, the doors

---

³ These videos are available at projects.propublica.org/parler-capitol-videos and are sorted by time stamps. Each of these videos is tagged with a gold "near the Capitol" label.  The videos are

were finally breached by rioters, and a massive assault on police officers followed.  Again, the defendant did not participate, but he stood by and recorded, as depicted below.



After witnessing this second mob assault, the defendant still did not leave the building. Instead, he moved even deeper into the Capitol to the third floor of the building.  Recording his journey, the defendant walked through hallways lined with what appeared to be offices chanting "defend your liberty, defendant your constitution" with a crowd of people.  The defendant again attempted to gain access to four closed, and apparently locked, doors located along the hallway.

---

timestamped at 2:21 p.m. (the first video at this time stamp), 2:23 p.m. (there are two videos with this time stamp, and both are of the Rotunda Doors), and 2:25 p.m. (the first video at this time stamp).

When he came to the end of that hallway, the defendant turned left into the Senate Gallery Hallway. There, he entered the Senate Gallery and photographed himself inside. He posted the photograph to Facebook, where it was eventually provided by a tipster to the FBI.



The defendant deleted his Facebook account prior to the FBI learning about his conduct on January 6. In total, the defendant spent approximately 20 minutes inside of the Capitol.

*Anthony Mariotto's Interview with the FBI*

On January 16, 2021, prior to his arrest, the FBI contacted the defendant over the phone and asked if he would speak to them. The defendant agreed and told them "I knew you guys were eventually going to call." He admitted to the agents that he was inside the Capitol on January 6, that he took the posted the selfie photograph and deleted his Facebook account soon afterwards.

He told the agents, "I'm not a member of any hate group, I got caught up in the moment."  He further explained that he thought he was a part of history, and that he did not break or steal anything.  He also claimed that some of the police were "letting people through."  However, when the agents asked if he was aware that police were also trying to keep people out of the building, and that it was wrong to enter, the defendant replied, "100%."  The agents also asked the defendant if he had any video or photographs, and he admitted that he did and agreed to provide them to the FBI.  The defendant also stated that he would take responsibility for his actions.

Three days later, on January 19, 2021, prior to being charged in the case, the defendant met with agents and provided them with his cell phone and the unlock code so they could search the phone.

*The Defendant's Interview with the Press*

On January 23, 2021, the day after he was arrested, Anthony Mariotto gave an interview to his local news station.  During that interview, the defendant reiterated his belief that he thought he was doing something patriotic and claimed that "there were good people there."  He stated, "I don't ever advocate violence," and "I would never hurt anybody in my life."  He told the interviewer that some of the police officers were waving them in when he entered, although he also acknowledged that it was "not all of them."  The defendant stated that he does not dispute that he trespassed but that his "entry was not violent," referring to that allegation as "fake news."  Remembering the "overwhelming feeling to get in there with all the other patriots," the defendant explained that "I was in the front, so for all I know everyone was coming in and we were going to surround it and wave our flags and say we stopped the proceedings."  The interview concluded by reporting that the defendant would protest differently if he had the chance to do it again.

*The Charges and Plea Agreement*

On January 21, 2021, Anthony Marriotto was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2).  He was arrested the next day at his home in Florida.  On February 8, 2021, Anthony Mariotto was charged by five-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(B), (D) and (G).  On September 24, 2021 he pleaded guilty to Count Five of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  By plea agreement, the defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.  The defendant must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6).  We now turn to these factors.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated

13

sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.  Had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

The defendant expressed his contempt for orders to stay out of the Capitol grounds almost immediately.  Upon seeing a sign on the Capitol lawn that instructed "area closed," his reaction was to scoff, "yeah, right" and pointedly walk around it.  He entered the Capitol building through the Senate Wing Door chanting "Our House" minutes after it was breached by other rioters and immediately and joined the mob of people parading through the hallways.  In the relatively short period he was inside the Capitol, the defendant traveled to several different areas.  While doing so, he attempted to open closed doors and joined the chants of "where are the traitors."  When he entered the Crypt and saw the police line forming, he commented, "yeah, like they're going to stop us."  As the mob overran the officers in the Crypt he stood by and took video.  He took additional video of rioters assaulting officers at the Rotunda Doors.  The defendant ultimately ended up in the sensitive and restricted Senate Gallery, where he took a selfie that he later posted to social media with the comment "this is our house."  After about twenty minutes, the defendant finally departed the Capitol.

Upon being contacted by the FBI, the defendant immediately admitted to his presence in the Capitol and indicated that he would accept responsibility.  He also admitted to the FBI that he had videos and photographs from that day on his phone and agreed to provide them to law enforcement.  To that end, on January 19, 2021, prior to being charged in the case, the defendant

met with agents and provided them with his cell phone and the unlock code so they could search the phone.

The nature and the circumstances of this offense establish the need for a restraint on the defendant's liberty as a consequence for his actions in this matter.

### B.  The History and Characteristics of the Defendant

As set forth in the Presentence Investigation Report, the defendant has no criminal history. ECF No. 31.  He is and has been steadily employed.  The defendant appears to have strong familial support – he is married with children and is maintains an emotionally supportive relationship with his mother.  Based on a review of the defendant's cell phone contents and other investigative steps, the Government currently is not aware of the defendant having an association with extremist groups, promoting violence, or engaging in any other criminal conduct.  The defendant has been fully compliant with his pre-trial conditions of release and was cooperative with law enforcement. He expressed an interest in pleading guilty at the outset of the case.  When recommending an appropriate sentence, the government gives weight to the defendant's early resolution of this case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70; *United States v. Matthew*

*Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country.   That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The defendant clearly knew that his presence inside the Capitol was wrong when he first saw and scoffed at the "Closed Area" sign on the Capitol Lawn fence.  Even more troubling, however, was the defendant's casual appreciation for the chaos and mayhem surrounding him, and that after observing it on two separate occasions he did not leave but went deeper into the Capitol each time.  This is compounded by his post-arrest interview with a local news organization where he admitted it was his intent that he and the other rioters would "stop the proceedings," and where he minimized his own participation by claiming that his entry into the Capitol was "not violent" and that he merely trespassed.  Perhaps in the most literal sense the defendant's entry into the Capitol was not violent because he did not personally smash out windows, destroy property, or attack police officers.  However, his unconcerned observation and video recording of the disorder and havoc, along with his commentary, paints a very different picture.  Indeed, his statement to

the interviewer that he does not "ever advocate violence," is belied by his conduct inside the Capitol when he stood by and recorded the multiple attacks against law enforcement officers. The defendant's chants of "where are the traitors" while attempting to open closed doors and the statement "yeah, like they're going to stop us" as he encountered a police line do not reflect the mindset of a mere trespasser or one who eschews violence. Rather, the defendant's conduct suggests a tacit encouragement of the violence against the officers and illustrates his intent to stop the certification of the election and the peaceful transfer of power.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probationary sentence should not necessarily become the default.[6]  Indeed, the government invites

---

[5]  Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC).  The government is abiding by its agreements in those cases but has made no such agreement in this case.  *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track"

the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration.  Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Five of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor. 18 U.S.C. § 3559(a)(7).  Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.  In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006).  "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences.").  In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).  *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  Because the Sentencing Guidelines do not apply here, the sentencing Court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity.  *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007).  The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims.  Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent.  The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in *United States v. Derek Jancart and Erik Rau*, 21-cr-00148 (JEB) for reference.  Jancart and Rau received sentences of 45 days of incarceration.  They observed significant violence as they approached the Capitol building and laughed and cheered upon seeing it.  Like Mariotto, Jancart and Rau entered through the Senate Door exactly five minutes after it was breached.  The duo, also like Mariotto, made their way to a highly sensitive area of the Capitol building, that is, Speaker Pelosi's conference room, whereas Mariotto took his selfie in the Senate Gallery.

Similarly, in *United States v. Matthew Mazzocco*, 21-cr- 00054 (TSC), the Court imposed a sentence of 45 days of incarceration where Mazzocco filmed and photographed the violence in and around the U.S. Capitol Building, including at the Rotunda Doors, entered the Capitol through the Senate Wing Door, and, like Mariotto, made his way to a restricted area of the building – the Spouse's Lounge.

Additionally, in *United States v. Jennifer Leigh Ryan*, 21-Cr-00050 (CRC), the Court imposed a sentence of 60 days of incarceration where Ryan entered the Capitol despite seeing significant violence outside and provided several interviews to different news outlets minimizing the events of January 6.  Thus, a sentence in line with the Government's recommendation would not be disparate to other sentences being imposed for similar conduct.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id*. at 1095.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Anthony Mariotto to a split sentence of four months of incarceration, a period of 36 months of probation, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481 053


By:      /s/ *Kimberley C. Nielsen*
KIMBERLEY C. NIELSEN
Assistant United States Attorney
N.Y. Bar No. 4034138
555 4th Street, N.W., Room 9913
Washington, D.C. 20530
Phone: 202-252-7418
Email:  Kimberley.Nielsen@usdoj.gov