UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO.   21-CR-094 (RBW) |
| v. | : | |
| | : | |
| ANTHONY R. MARIOTTO, | : | |
| Also known as "TONY MARIOTTO," | : | |
| | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S OPPOSITION REGARDING DEFENDANT'S MOTION FOR EARLY TERMINATION OF PROBATION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby responds to Defendant Mariotto's Motion for Early Termination of Probation (ECF No. 41).  For the reasons set forth below, the government opposes this request.

### Background

*A. Defendant's Offense Conduct*

As this Court is aware, the defendant, Anthony Mariotto, participated in the January 6, 2021 attack on the United States Capitol — a criminal offense unparalleled in American history. This offense represented a grave threat to our democratic norms. For his role, the defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.

On January 6, the defendant entered the U.S. Capitol through a door that had previously had its glass windows broken approximately five minutes after it had first been breached by rioters. As he admitted at the time of his guilty plea (ECF No. 38, p. 3), he then walked around various hallways, the Crypt of the Capitol, and the Rotunda, during which he was chanting "U.S.A." with

1

the crowd. Prior to leaving the building, the defendant posed in the gallery of the Senate Chamber and took a self-photograph, also known as a "selfie." The defendant later posted the selfie photograph on Facebook with the following caption: "I'm in [sic] And there are just a few [sic] This is our house".

What the plea agreement does not, and cannot, capture is the visceral spectacle of the defendant's behavior inside the Capitol Building. The defendant recorded much of his time inside the building, and the government presented some of this footage to the Court in its Sentencing Memorandum (ECF No. 35) and during its sentencing allocution. That footage showed that the defendant's conduct was some of the most egregious of the misdemeanants from that day. It captured the defendant as he made his way to the front of the mob, as he pushed his way up the stairs on the northwest side of the building, which was covered with scaffolding and tarps, and recorded a voice consistent with the defendant's as it stated, "no one is going to steal our fucking election." (ECF No. 35, pp. 4-5).

Entering the Capitol building through the Senate Wing door – which had a visibly broken window and broken out windows on either side of it from the rioters that breached the windows and door approximately five minutes earlier – a voice consistent with the defendant's chanted "Our House" as he walked through the door. Other rioters yelled "welcome home, patriots," and a voice consistent with the defendant's answered, "that's right," all while an alarm blared in the background and the defendant raised his fist in triumph. The defendant later claimed that officers waved him inside, however there is no evidence of any officers doing so when the defendant entered. Once inside the building, the defendant attempted to open multiple closed, and apparently locked, doors while a voice consistent with the defendant's yelled, "where are the

traitors?"  *Id.* at 5-6.

He then traveled to the Crypt, arriving just moments after United States Capitol Police (USCP) officers were forming a line to block the rioters.  Apparently observing this, a voice consistent with the defendant's yelled, "yeah, like they're going to stop us."  The defendant again made his way to the front of the crowd, where he stood in front of the officers and recorded their efforts to contain the throng of people confronting them.  *Id.* at 6-7.

After watching, and recording, the police struggle with the crowd in the Crypt, the defendant he made his way upstairs to the Rotunda Doors, where three USCP officers, one of whom was wearing riot gear, were guarding the door.  Rioters yelled at the officers to open the doors, outside of which a large mass of people had gathered to enter the Capitol building.  Open-source videos showed what was happening outside the door – the amassing of a mob of people who would soon carry out one of the most violent assaults on law enforcement of the day.  Police officers, some carrying riot shields, attempted in vain to disperse the crowd around the Rotunda Doors.  The crowd, too large to be moved, chanted "Stop the steal," "Whose house? Our house!" and "USA!"  A loud bang was heard, and a plume of smoke issued from near the door, presumably from the discharge of a smoke or tear gas grenade.  A few minutes later, the doors were finally breached by rioters, and a massive assault on police officers followed.  The defendant stood by and recorded.  *Id.* at 8-9.

After witnessing this second mob assault, the defendant still did not leave the building.  Instead, he moved even deeper into the Capitol to the third floor of the building.  Recording his journey, the defendant again walked through hallways lined with what appeared to be offices chanting "defend your liberty, defendant your constitution" with a crowd of people.  The

defendant again attempted to gain access to four closed, and apparently locked, doors located along an area where we now know staffers and other members of Congress were hiding, in fear for their lives. When he came to the end of that hallway, the defendant turned left into the Senate Gallery Hallway. There, he entered the Senate Gallery and photographed himself inside. He posted the photograph to Facebook, with the caption "I'm in. And there are just a few. This is our house." The defendant deleted his Facebook account shortly after posting this photo. *Id.* at 9-10.

On January 23, 2021, the day after he was arrested, the defendant gave an interview to his local news station. During that interview, the defendant reiterated his belief that he thought he was doing something patriotic and claimed that "there were good people there." He stated, "I don't ever advocate violence," and "I would never hurt anybody in my life." He told the interviewer that some of the police officers were waving them in when he entered, although he also acknowledged that it was "not all of them." The defendant stated that he does not dispute that he trespassed but that his "entry was not violent," referring to that allegation as "fake news." Remembering the "overwhelming feeling to get in there with all the other patriots," the defendant explained that "I was in the front, so for all I know everyone was coming in and we were going to surround it and wave our flags and say we stopped the proceedings." *Id.* at 11.

*Defendant's Sentence*

On December 17, 2021, the defendant was sentenced by the Court. Consistent with the position that the defendant's conduct was some of the most egregious of those charged with only misdemeanors, the government requested a split sentence of four months of incarceration, a period of 36 months of probation, and $500 in restitution (ECF No. 35). The defendant asked this Court to sentence him to a period of 12 months' probation (ECF No. 32). Ultimately, after hearing

4

arguments from both parties, the Court sentenced the defendant to 3 years of probation, $500 in restitution, and a $5000 fine (ECF No. 39).

## Discussion

The defendant has completed approximately 14 of the 36 months of supervised release to which he was sentenced. The Court may terminate a term of probation imposed in a misdemeanor case at "any time… if it is satisfied that such action is warranted by the conduct of the defendant and the interest of justice." 18 U.S.C. § 3564. In making the determination, the court is required under 18 U.S.C. § 3564 to consider the factors enumerated in 18 U.S.C. § 3553(a), including deterrence, public safety, rehabilitation, and consistency in sentencing. *Id.* As many courts have recognized, mere compliance with the conditions of probation does not warrant early termination. "Rather, the defendant must show new or unforeseen circumstances, such as exceptionally good behavior, to warrant relief." *United States v. Rusin*, 105 F.Supp.3d 291, 292 (S.D.N.Y. 2015) ("Early termination of probation is not warranted as a matter of course. . . . Early termination is not warranted where a defendant did no more than that which he was required to do by law (internal citations and quotation marks omitted)); *see also United States v. Etheridge*, 999 F.Supp.2d 192, 195 (D.D.C. 2013) (noting that for early termination of supervised release, a defendant should "show something of an unusual or extraordinary nature in addition to full compliance."); *United States v. Medina*, 17 F.Supp.2d 245, 257 (S.D.N.Y 1998) ("Unblemished" conduct while under supervision cannot alone be classified as "exceptional" and "cannot be sufficient reason to terminate [supervision] since, if it were, the exception would swallow the rule"); *see generally United States v. Caruso*, 241 F.Supp.2d 466, 468-69 (D.N.J. 2003); *United States v. Paterno*, No. 99-cr-037, 2002WL1065682 at *3 (D.N.J. Apr. 30, 2002). Indeed, it bears noting that supervision

serves a "multitude of purposes – it is not only designed for rehabilitation and re-integration . . . supervised release is also a form of punishment." *United States v. Mathis-Gardner*, 110 F.Supp.3d 91, 94 (D.D.C. 2015) (denying motion for early termination of supervised release), *citing United States v. Ginyard*, 215 F.3d 83, 87 (D.C. Cir. 2000) ("Supervised release is punishment").

The government commends the defendant's performance while on supervised release: based on the representations in his Motion and statements by probation, the defendant has had no violations, is drug-free, maintains stable housing, and is employed. The defendant's compliance with his conditions of release in the first year of probation signals that he understands the seriousness of his conduct.

Nevertheless, termination of probation is not justified at this time. The defendant's motion fails to raise any new or unforeseen circumstances that warrant early termination of his three-year period of probation. Rather, his motion simply claims that he has complied with his conditions of probation and that it is inconvenient that he must relegate his time between his two homes in Georgia and in Florida to only a few months at a time. This does not warrant early termination. *See Rusin*, 105 F.Supp.3d at 292.

This Court already carefully considered the § 3553 factors in imposing a sentence. Admittedly, review of some of the factors, including the defendant's history and characteristics, weigh in favor of early termination. However, the defendant's criminal conduct on January 6 was exceptionally serious, and serving the full period of probation is necessary to deter misconduct by others, to ensure that the public is protected, and to avoid sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Indeed, this last factor was

given significant consideration and carefully balanced by the Court in rendering the defendant's sentence.  Where the defendant has only served 14 months of probation, his sentence will be one that is disparate from others similarly charged.  Only a handful of January 6 defendants were given sentences of 12 months of probation or less, without additional periods of home confinement or even incarceration.  And those that were given such lenient sentences were those who were the least culpable of the rioters that day.

Notably, the defendant's supervision involves minimal requirements that do not impair his ability to work or engage in other activities in the community.  He was permitted to transfer his supervision to Florida, his home state, as well as to travel to his second home in Georgia for a month at a time.  According to representations in his motion (ECF No. 41, ¶ 12), he has not had to report for the past seven (7) months.  Accordingly, his probation effectively involves nothing more than the requirement that he not be re-arrested.  Given that the core of supervision at this point is that the defendant does not commit any new offenses, continuing his probation does not impose significant limitations on him, nor does it unduly burden or further tax any of U.S. probation's resources.

Early termination may well be appropriate in this case prior to the conclusion of the three years; however, it is the government's position that it is premature at this juncture to terminate the defendant's supervision, as he is has not even completed half of his period of probation.  Given the limited impositions that the defendant's probation imposes, effectively, his supervision only limits his ability to commit new offenses (and be subject to potential incarceration for violating his probation as a result of the new offense).

Accordingly, the United States respectfully requests that Court deny the defendant's motion for early termination of probation.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481 053

By:    /s/ *Kimberley C. Nielsen*
KIMBERLEY C. NIELSEN
Assistant United States Attorney
N.Y. Bar No. 4034138
601 D Street, N.W.
Washington, D.C. 20530
Phone: 202-252-7418
Email:  Kimberley.Nielsen@usdoj.gov